EXHIBIT B

# Menachem Langer

145 Deerfield Lane
Lenoir City, Tennessee 37772
mlangergmd@gmail.com

May 10, 2020

Board of Law Examiners
Nashville, Tennessee

Dear Chairperson and members of the TN Board of Law Examiners:

I am writing to share serious concerns that I have regarding my character and fitness interview, which was conducted this past Friday, May 8, 2020. Upon the conclusion of the interview, I reached out to my Professor, Dean and mentor, the Honorable Gary Wade, with whom I spoke at great length concerning the matter outlined below. Judge Wade asked me to share with the committee that he is offering to serve as a reference on my behalf regarding my character and fitness, as well as the fact that any disability I may have in no way impacts my ability to practice law, and in no way impacted my ability while in law school.

My interview was scheduled with Steven Hurdle, Esq., who reached out via email last week to ask if (1) he may record our Zoom session, and (2) to advise me that he asked another committee member, Marti Crawford Esq. to also be present on the call. When I asked if recording interviews was customary, he stated that nothing is customary in this current climate, but that he felt it would help him to prepare his report. I had no option but to comply, which in hindsight was beneficial, considering the disturbing line of questioning that ensued during the interview. I also recorded the session, and can send the recording to you, should you need it.

Following opening introductions and a review of my background, Ms. Crawford immediately brought up my disability, stating that, "it is [her] understanding that [I was] diagnosed several years ago with MS." She voiced her concern with my ability to handle the workload of an attorney given my medical condition. In my introductory statement I explained that I graduated from law school in two-and-a-half years and passed the MPRE and the Bar Exam with above average scores. These grades, scores and my law school performance should have been a sufficient indication of my cognitive abilities and any concerns regarding a professional workload.

Over the course of almost one hour, Ms. Crawford and Mr. Hurdle questioned specific elements of my medical history and disability including medications and treatments as well as past, present and potential future medical conditions to

question my physical and cognitive abilities as an attorney. Specific questions centered on the following:

- My medication history
- Severity of my MS diagnosis
- Current prognosis
- Specific symptoms
- Whether my condition would interfere with my ability to practice law
- My specific class of MS: remitting-relapsing MS, or progressive MS
- The name of my treating physician
- Past diagnostic testing
- The timing of the appearance of different symptoms
- Whether I have the cognitive ability with my disability to practice law
- History of my MS disease progression
- Whether I stay stable and level, or experience fluctuations
- Whether I ever had a deterioration in my condition
- Whether I have mental problems associated with my MS
- Whether my condition affected my ability to handle law school work
- Whether I had any episodes of perceived cognitive issues
- I was asked if the medication I take is considered to be one for severe MS. When I stated that it is not, Ms. Crawford replied, "so if that's what the Mayo Clinic says are they wrong?"
- Whether I think I am capable of handling a job that requires a high level of intellect

To question one's professional ability based on their medical history rather than academic performance is not only a violation of Title II of the ADA, but a flawed and inappropriate line of reasoning. It is impossible to predict future mental and physical disabilities, as well as professional job performance in patients with stable medical conditions. Under the interviewers' line of thinking, admitted attorneys who become ill should be required to disclose and be subject to similar scrutiny – clearly not a practical or desirable outcome.

In my law school class at LMU there were three students with Type I Diabetes. Will they also be subjected to a line of questioning regarding the fact that their disability can result in cognitive impairment? Hypoglycemia can result in confusion, irritability, shakiness, and nervousness. In addition, hyperglycemia can result in headaches, trouble concentrating, blurred vision, fatigue and confusion. Will their rights also be violated in a humiliating manner, and will their ability to practice law also be inappropriately judged?

After almost an hour of extremely personal questions regarding my disability, I made the following statement: "to be honest with you, I feel like I am being judged because I have a disability that is being used against me to determine whether I am fit to practice law…" I added that, "there is nothing to lead one to believe that I can't function in the capacity as an attorney." I also stated that, "I don't want to be judged on a disability when I managed to finish law school, finish

well, pass the bar, there is no other test to show my ability, if there was an issue I would not have been able to do all that." The statement did not seem to have an effect on the examiners, as the questioning regarding disability continued throughout the interview.

While I remained calm and friendly and attempted to answer all questions in a forthcoming and open manner, I found the experience of questioning whether my disability will interfere with my ability to practice law to be humiliating and degrading. Immediately following the interview I called my mentor, the Honorable Gary Wade, because I was so shaken up that I did not know what to make of the interview. I believe that my demeanor alone during the two-and-a-half-hour process speaks volumes about my cognitive abilities, ability to remain focused, and preparedness to handle stressful situations.

While I am sure this committee knows and understands the law far better than me, forgive me for outlining it below, as I feel that it is relevant within the context of this correspondence:

Discrimination by state governments regulating entry into and membership in licensed professions falls under ADA Title II. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits, services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 I have met the academic requirements to receive a license, I have passed the necessary exams with above-average scores, I have no criminal record or even a speeding ticket since I was sixteen-years-old. To base my fitness to practice law based on my disability is clearly a violation, and hopefully one that this board will not allow. Because such a substantial portion of my interview was devoted to my disability, I fear that it will become a factor in the committee's decision.

Courts have concluded that licensing boards are Title II entities subject to the ADA because they are empowered by state governments to provide benefits, services, and programs. See, e.g., Theriault v. Flynn, 162 F.3d 46 (1st Cir. 1998); Burke v. State Bar of Cal., No. C 06-06950 WHA , 2007 WL 39397 (N.D. Cal., Jan. 4, 2007). For instance, in Bartlett v. New York State Board of Bar Examiners (2nd Circuit), the court concluded that if the applicant had a disability, she was entitled to the requested accommodations because the Board was subject to Title II of the ADA. Id. At 86

There is little question that the Board of Law Examiners is an entity that is subject to the protections offered by Title II.

Other cases against licensing boards alleging Title II discrimination have turned on the content of application questions. In Ellen S. v. Florida Board of Bar Examiners, an applicant for admission to the bar sued the Florida Board claiming that application questions pertaining to an emotional disorder violated the

ADA. 859 F.Supp. 1489 (S.D. Fla., 1994). The district court for the Southern District of Florida held that a defendant need not have knowledge of the plaintiff's disability in order to violate the ADA. Id. At 1491 The court further held that questioning the applicant as to whether she had ever sought treatment for a nervous, mental, or emotional disorder or had been diagnosed as having such a condition violated Title II. Id. At 1494

Here, not only did the examiners have knowledge of my disability, but when I stated that I felt my disability was being used against me, ignored my statement and continued with the line of questioning.

In Clark v. Virginia Board of Bar Examiners, a federal district court held that a Virginia bar application question asking whether an applicant had been treated for mental illness or had obtained counseling in the past five years violated the ADA. 880 F.Supp. 430, 433 (E.D. Va., 1995). The district court for the Eastern District of Virginia decided that absent showing the applicant would pose a direct threat to her clients, her failure to answer the open-ended mental health inquiry did not prevent her from becoming a member of the bar. Id. At 446.

Here, there is no evidence that I would pose a direct threat to my clients, as evidenced by my ability to not only graduate from law school in an expedited manner, but my ability to pass the required exams. The examiner was aware that I passed the Bar this past February, and any question pertaining to my cognitive ability should have been put to rest with those results. Instead I was subjected to continuous in-depth questioning that far exceeded not only what is legal, but also what was required to obtain the information required.

Within the last decade, there have been few changes to the law in regards to ADA Title II and professional licensing. Each of the cases cited in the section above are still in force; none have been overturned, or even questioned. Employers generally assume a candidate meets essential qualifications if board-certified. Thus, Title II litigation against state boards largely focuses on subjective decisions boards make when balancing their duty to protect the public, with the rights of individuals seeking membership into the profession. Much of the law regarding licensing has been settled since the mid-1990s; Stanley S. Herr, Questioning the Questionnaires: Bar Admissions and Candidates with Disabilities, 42 VILL. L. REV. 635, 680 (1997). However, district courts continue to interpret and clarify acceptable application questions. Boards may ask questions concerning disabilities, although prudential concerns limit the scope of these questions. For example, impairment actually must limit the applicant's ability to perform the specific task or job.

Broad questions about mental illness are not allowed. To satisfy judicial scrutiny, questions about mental illness must specifically address <u>presently occurring illness</u>. A question probes too far into the past when the value of the question to demonstrate current impairments is substantially reduced by the lapse of time. See Mariam Alikhan, The ADA is narrowing Mental Health Inquiries on Bar

Applications: Looking to the Medical Profession to Decide Where to Go From Here, 14 GEO. J. LEGAL ETHICS 159, 163-67 (2000); Herr, supra note 32, at 640-46.

Here, I advised the examiners that I have no current condition that limits my ability to practice law. Therefore, the continued questioning regarding my ability in the first place, but especially after I stated multiple times that it is not a "presently occurring illness," was excessive. Further, I advised the examiners multiple times that I have no impairment that actually limits my ability to perform the work of a lawyer, as evidenced by the fact that I graduated early and excelled on licensing exams. Clearly, I have no current inability to function as a lawyer intellectually, but was subjected to this line of questions over and over, with nearly a full hour in totality solely dedicated to my disability.

In addition to the questions regarding my disability, I was extremely concerned regarding questions by Mr. Hurdle as to my professional title from prior degrees. I was asked by Mr. Hurdle if I ever refer to myself as "Dr. Langer," and I responded that I sometimes do; I earned a medical degree, which is no different than a high school teacher or college professor with a PhD, a dentist, an optometrist or chiropractor using the suffix, "Dr." I explained that I have never misled anyone regarding the fact that I do not practice medicine. Even after I explained that the ID badges issued to me by the human resource departments of both medical centers where I was employed read "Menachem Langer, MD, MBA," Mr. Hurdle continued to indicate that this was inappropriate and indicative of my character because someone could misinterpret using my earned degree and title as that of a practicing physician. Interestingly in a healthcare setting, neither facility, nor human resource department, shared Mr. Hurdle's concerns.

Mr. Hurdle also seemed extremely interested in my personal interactions with my ex-wife, and whether the tone I used with her could be used to consider me unfit to practice law. If my ex-wife sent information about me to Mr. Hurdle, surely the fact that we are actually divorced and do not get along, would taint her opinions against me (and would be treated as suspect by an examiner in receipt of such material). I explained to Mr. Hurdle that if we still loved, or even liked each other, we'd likely still be married, so this personal and irrelevant line of questioning concerns me. We are divorced specifically because we couldn't get along. I have never had charges filed against me for anything remotely pertaining to my ex-wife. In fact, I shared with Mr. Hurdle that when my ex-wife was physically assaulted by her now ex-husband, she came to me, and not her parents or friends, for help and shelter. My wife and I took her in for several days and helped her recover. She is the mother of my children and we will always be a family. In addition, she and her parents travelled to Israel with us last summer, as one family to celebrate our daughter's Bat Mitzvah.

Roughly thirty minutes of the interview were spent debunking unsubstantiated material that was apparently sent to the Board by Daniel Crowe (who will eventually submit his own character and fitness application to this board) against

whom I have an Order of Protection. Mr. Crowe is my ex-wife's current boyfriend. The Order for Protection against Mr. Crowe was issued in February 2020 by Judge Dale of the General Sessions Court of Loudon County, after he sent my wife and me (as well as other family members) an endless stream of threatening messages, which necessitated calling the police on several occasions. In clear violation of a series of bridging Orders of Protection that were in place until the final order was signed (in May 2020), Mr. Crowe sent material to various entities including the zoning board in my county, where he does not reside and apparently, the TNBLE. All of his allegations were dismissed by the Court as having no basis in reality, and the one-year Order of Protection was subsequently issued. Additionally, Mr. Crowe has two currently pending Contempt of Court motions that were filed against him for violating the Orders.

The TN Appeals Court found Mr. Crowe liable for fraud, deceit, material and intentional misrepresentation, conversion, and theft in a suit that was filed against him in 2003. The Court further noted that Mr. Crowe had less credibility than the mentally challenged young woman he abused. If I am being judged by my conduct or behavior, one would hope that the examiners would have vetted the material that they received and understood that the provider of such material not only has an order of protection against him for stalking, harassing, and threatening me, but was also found to lack a moral compass by one of the highest courts in the state.

While I should not legally have to defend my cognitive abilities, I would like to assure the committee that I am not impaired in any way. I believe that my personal medical information made its way into the interviewers' hands in a suspicious manner, but they had a choice: They should have ethically and legally disregarded my disability and not made it the centerpiece of our session. The entire situation was made worse by the fact that I had to defend myself to not only one, but two individuals, who were clearly in possession of sensitive and personal material, and refused to stop this line of questioning even after I voiced my concerns.

Graduating from law school is one of my greatest accomplishments. Although I have other degrees, I believe that the legal field was always "my calling." I took my studies seriously and enjoyed my time immensely. I was viewed as a leader at the University and was asked to serve as a Dean's Peer Leader. I have never had any disciplinary action associated with my academic career and have not so much as had a speeding ticket since I began driving at the age of sixteen. My professional career has also flourished and I have received numerous promotions and awards. I feel physically, cognitively, morally and ethically ready to proudly serve in our field.

I am grateful for the opportunity to raise my concerns and hope that you will contact me if you have any questions, require clarification or additional information. Again, I can provide the recording, as well as an index I have

compiled, which summarized the topics covered with the corresponding minutes for your ease in fast-forwarding any part of the recording.

Respectfully submitted,

Menachem Langer