TENNESSEE SUPREME COURT
BOARD OF LAW EXAMINERS

IN RE:

    MENACHEM LANGER,
    Applicant.

Docket No. 20-18

## APPLICANT'S RESPONSE TO SHOW CAUSE ORDER

Menachem Langer, M.D., respectfully submits this response to the Show Cause Order issued by the Board pursuant to Tenn. Sup. Ct. R. 7, § 13.01. As described below, an individual hostile to Dr. Langer has made a supreme effort to impugn Dr. Langer's character and fitness for admission as an attorney. The information submitted has been taken out of context and twisted into a hailstorm of purported issues. Dr. Langer responds herein to all of the issues raised in the Show Cause Order, and submits the following, together with the attached exhibits. Dr. Langer looks forward to presenting further evidence at the hearing set for this matter.

### BACKGROUND & CONTEXT

In the fall of 2019, Dr. Langer was completing his last year of law school at Lincoln Memorial University. He was friends with another student named Daniel Crowe.[1] Their friendship was one that grew out of the pressures of law school, and they were otherwise very different people. Mr. Crowe promoted his own reputation as a playboy, and made no secret of his use of pills, cocaine, and other drugs, and bragged about drunken revelries in which he cheated on women he was dating or to whom he was married. Dr. Langer was also told by Mr.

---

[1] Extensive court findings concerning Mr. Crowe's character and conduct are set forth in a Court of Appeals opinion. *Slaughter v. Slaughter,* 2003 Tenn. App. LEXIS 670 (Tenn. Ct. App. 2003) (copy attached as **Exhibit A**). Mr. Crowe is also an applicant for admission to the bar, although he has not yet been listed among those who have passed the bar examination.

Crowe's brother-in-law that members of Mr. Crowe's family would not let him be around their children unsupervised because they mistrusted his judgment and example. Mr. Crowe was a good law school friend, within the limited context of law school classes, but was not someone Dr. Langer would have befriended outside the limited context of law school, much less considered as a model for his children to look up to. Then, in a stroke of bad luck, Mr. Crowe met Dr. Langer's ex-wife, began a romantic relationship with her, and was suddenly in close proximity to Dr. Langer's children. When Dr. Langer expressed his objections to this, Mr. Crowe retaliated and told Dr. Langer he would make him suffer. In that effort, Mr. Crowe has built a case against Dr. Langer in this forum, using information he obtained from Dr. Langer's ex-wife. The evidence does not hold up, however, as described below.

## PROCEDURAL HISTORY

Dr. Langer graduated from law school in December 2019. He submitted his bar application on November 24, 2019, and sat for the February 2020 bar examination. Dr. Langer's bar results – passed – were announced on April 13, 2020. The Board issued a Show Cause Order on August 7, 2020. Among other things, the Show Cause Order instructed Dr. Langer to report to the Tennessee Lawyers Assistance Program for a "fitness for duty evaluation." At TLAP's instruction, Dr. Langer reported to the Multidisciplinary Comprehensive Assessment Program (MCAP) of Chicago for three days of in-person evaluation. A copy of the report is attached as **Exhibit B**. Key findings from this report include:

- "neurocognitive testing in this assessment is indicative of normal cognitive functioning…."
- "labs were negative for mood-altering substances…."

- "did not meet criteria for any Axis I diagnosis except for an unspecified anxiety disorder diagnosed during his divorce proceedings in 2012/2013…."
- "In the opinion of this assessment, he does not meet criteria for a personality disorder that would prohibit him from the practice of law."
- "Dr. Langer should not be restricted from practicing law…."

**FACTS**

I. **Personal and professional background.**

Dr. Langer grew up in New York and Texas. In his mid-forties, Dr. Langer is close with his siblings and his mother resides with him since the death of his father. Dr. Langer has an undergraduate degree in biology from University of the Incarnate Word; an M.D. from Poznan Medical Science University in Poland; an M.B.A. from the University of Tennessee; and a Juris Doctor from Lincoln Memorial University. Dr. Langer has not practiced clinical medicine since obtaining his medical degree, instead pursuing his M.B.A. and a career in healthcare administration prior to entering law school.

II. **Health.**

Dr. Langer was diagnosed with relapsing-remitting multiple sclerosis ("MS") in 2009. He has been treated continuously since 2009 at the Multiple Sclerosis Institute at The Mt. Sinai Hospital in New York. He undergoes biannual MRI studies and monthly infusions of an immune modulator, and flies to New York annually to consult with his doctors. "Relapsing-remitting MS" is the most common form of MS and is characterized by periods of relapse followed by periods of partial or complete recovery. Keeping MS in remission is the treatment goal because it is an incurable and irreversible disease and will ultimately lead to death. An immune disorder,

3

Case 3:22-cv-00138-TRM-JEM   Document 1-5   Filed 04/18/22   Page 3 of 20   PageID #: 61

MS responds well to modern immune inhibitors and biologic treatments. Dr. Langer has been largely in remission since he began treatment with immune modulator therapy in 2012.

MS can have a variety of symptoms. When not in remission, Dr. Langer experiences numbness in parts of his body, loss of balance, slowed cognitive functioning, and short-term memory problems. While Dr. Langer can still cognitively process during a relapse, his thinking is slowed noticeably and he has trouble with memory recall. These symptoms resolve during remission. He has been in a period of remission since his relapse in 2012 and a change to new medication, and MRI studies of his brain conducted twice each year have not shown any significant worsening since that time.

### III. Marriage, divorce & child custody

Dr. Langer met his first wife, Dr. Kristen Carver, in 2001, and they married in 2003. They had a daughter in 2007 and a son in 2010. They separated in 2012 and a Final Decree of Divorce entered on June 17, 2013. Dr. Langer married his current wife, Jill Langer, in 2016.

From the time of their separation in 2012 until late 2019, Dr. Langer and Dr. Carver were able to negotiate their joint parenting with Dr. Carver's parents serving as informal mediators when there was disagreement.[2] They were, as Dr. Langer described it, "still a family," albeit a family with a degree of persistent bickering not uncommon among divorced couples working together to raise children. Dr. Carver has now had two husbands since her divorce from Dr. Langer, Jason and Mr. Crowe, and several boyfriends. She married Jason in 2018. When Jason assaulted Dr. Carver in May 2019, Dr. Carver sought respite at Dr. Langer's house. While Dr. Carver stayed with Jill Langer, Dr. Langer went to Dr. Carver's house to retrieve her clothes and personal belongings. Dr. Carver stayed with the Langers for a few days, until she felt she could

---

[2] The Show Cause Order states, "Applicant's divorce from Kristin Carver and the continuing litigation related to their parenting plan has been contentious and litigious." This is not accurate, as discussed in more detail, *infra*.

4

Case 3:22-cv-00138-TRM-JEM   Document 1-5   Filed 04/18/22   Page 4 of 20   PageID #: 62

safely go home.  Later, in July 2019, Dr. Carver and her parents went with Dr. Langer, Jill Langer, Dr. Langer's mom, sister, and all the children, to Israel for ten days.  "The whole family" went together.  In short, from 2013 through July 2019, the relationship between Dr. Carver and Dr. Langer was neither especially contentious nor litigious.  Indeed, from entry of the Final Decree of Divorce in 2013 until late 2019, there was <u>zero</u> litigation between Dr. Langer and Dr. Carver.  While describing the relationship as "contentious" may be subject to opinion and degrees of correctness, describing the relationship as "litigious" is indisputably incorrect.

As described above, Daniel Crowe was someone that Dr. Langer knew from law school. Shortly after Mr. Crowe's wife committed suicide in July 2019, he met Dr. Langer's ex-wife, Dr. Carver, when he invited Dr. Langer's daughter to his daughter's birthday party.  They began dating almost immediately, although neither informed Dr. Langer for some number of weeks. Dr. Langer had been friends with Mr. Crowe during law school, in a limited way.  They were very different people, but were friends within the law school environment, and Dr. Langer worked on several law school projects with Mr. Crowe.  Mr. Crowe promoted his image as a "bad boy" and playboy, and told stories about his exploits.  From things that Mr. Crowe told Dr. Langer, as well as comments and stories from other people, Dr. Langer knew Mr. Crowe to have a history of relationships with many women, infidelity, excessive alcohol consumption, and drug use.  He also knew of previous court findings concerning Mr. Crowe's character and predatory behavior toward a woman with assets, as reported in an opinion by the Tennessee Court of Appeals.[3]  Dr. Langer had no objection to Dr. Carver dating anybody she wanted.  He also had no qualms about being a friend to Mr. Crowe in the law school environment.  He did not, however, associate with Mr. Crowe outside of school:  they never once went out for drinks in the

---

[3] *See* note 1, *supra.*

evening, for example. From what he knew of Mr. Crowe, Dr. Langer had serious concerns about the safety of his children in the company of Mr. Crowe, and he voiced this objection to both Dr. Carver and Mr. Crowe. His concerns have been validated by subsequent events and the court's modification of his custody arrangement.

Dr. Langer's objection to Mr. Crowe's involvement in the lives of his children unleashed an aggressive and profane litany from Mr. Crowe in writing and in person. For example, the documents produced to Dr. Langer by the Board - as having been provided by Dr. Carver - include the following statements from Mr. Crowe to Dr. Langer:[4]

- "asshole tax will continue"
- "We will continue to fuck your shit up."
- "Fear not I will teach you some manners."
- "No one can help you bitch boy."
- "You better think very carefully before you sass me gaylord."
- "You will suffer more than any one should."

Based on these messages, and others, Dr. Langer obtained an Order of Protection against Mr. Crowe on February 11, 2020. The involvement of Mr. Crowe in the lives of Dr. Langer and his family also resulted in the restarting of custody litigation between Dr. Langer and Dr. Carver. In a recorded conversation between Mr. Crowe and Dr. Langer, provided to Dr. Langer by the Board, Mr. Crowe asserted that Dr. Langer owed unpaid child support and taunted: "I'll enjoy spending that money."[5]

---

[4] The Show Cause Order states that the record contains "examples of communication that was profane, combative, and sometimes threatening." It is respectfully submitted, and will be shown at the hearing of this matter, that such an interpretation can come only from a misunderstanding of the speaker or sender/recipient: the profane, combative, and threatening statements are by Mr. Crowe to Dr. Langer and his wife, Jill Langer.

[5] This comment is especially disturbing in light of the Court of Appeals describing his past conduct with Ms. Slaughter.

Upon information and belief, Dr. Carver has now married Mr. Crowe. The impact of Mr. Crowe's involvement in the life of Dr. Carver and the Langer children has not been positive, and the court has validated Dr. Langer's concerns. Despite repeat court orders, Dr. Carver has refused to pay for the children's school tuition, and contempt motions are pending against her. More significantly, while Dr. Carver and Dr. Langer enjoyed 50/50 shared custody since 2012, the court has now reduced Dr. Carver's custody to one night per week and every other weekend based upon a custodial evaluation conducted by Dr. Lance Laurence. A true copy of the court's order in this regard is attached as **Exhibit C**.

IV. **Employment.**

Completing his M.B.A. in 2006, Dr. Langer began his career at St. Luke's Roosevelt Hospital in New York City. By 2010, Dr. Langer and his wife wanted to move to Tennessee. Dr. Langer was hired as the CEO/COO of Cookeville Regional Medical Center (CRMC) and moved to Tennessee, while his wife stayed in New York for nearly a year thereafter.

In October 2012, Dr. Langer was wrongfully terminated by CRMC. Shortly thereafter, in late November 2012, his MS symptoms relapsed.[6] A settlement resulted from the wrongful termination, in a manner that would, among other things, provide Dr. Langer with health and disability insurance benefits. Formally, the result of the settlement was that Dr. Langer's termination from CRMC "for cause" was reversed; instead, he was given a severance package and his position was changed effective October 31, 2012, from CEO to that of Executive Consultant, with duties to include data, planning, and recruiting on an as-requested basis. The settlement provided Dr. Langer with continued employment through December 31, 2014, with

---

[6] The timing of his relapse in relation to his wrongful termination was likely not only coincidental. He was already going through his separation and divorce when he was wrongfully terminated. Stress is a factor in triggering or exacerbating relapse of MS.

health benefits continuing through December 31, 2015. Although there was no finding or admission of fault, the settlement and consultant position were in effect a mechanism for the hospital to compensate Dr. Langer for his wrongful termination and provide him with medical and disability benefits during his relapse. The hospital never requested services from Dr. Langer during his term as Executive Consultant. For this reason, he provided no consulting services during his term as Executive Consultant. By the end of his term as Executive Consultant, Dr. Langer's MS was again in remission and he was able to apply for and enter law school.

Beginning in late 2014, Dr. Langer began some work with Langer Healthcare Consulting, a consulting firm based founded by Dr. Langer; his father, Dr. Oded Langer; and his sister, Erris Langer Klapper, an attorney licensed in New York. The business slowed when Dr. Langer entered law school, followed by the death of his father, but continues at this time.

# SPECIFIC ISSUES IN SHOW CAUSE ORDER

The Show Cause Order identifies several issues of concern to the Board. These concerns have been addressed here, below, in five rough categories. Dr. Langer will supplement this response, as necessary, or as further requested by the Board, and will provide additional information at the hearing of this matter.

1. **Divorce and other litigation.**

As of the date of this response, Dr. Langer has been party to eight pieces of litigation. Some of these were discovered or initiated after Dr. Langer's application was submitted. Pleadings and other documents were previously submitted. However, in order to ensure that *every* required document has been submitted, a complete set of documents is being provided to the Board under separate cover, as indicated below.

   a. *Carver v. Langer,* **Knox County Circuit Court Div. IV, No. F-12-126134.**

This is Dr. Langer's divorce matter from Dr. Carver. The matter was filed in 2012 and initially resolved with a final decree of divorce in 2013. Contrary to the statement in the Show Cause Order, the divorce litigation was not contentious or especially litigious until very recently. Rather, the divorce was resolved in 2013, with each parent having 50% shared custody. The parties operated amicably and by agreement for more than six years, until Dr. Langer voiced his objection to his children being entrusted to Mr. Crowe given his concerns about Mr. Crowe's abuse of alcohol, drug use, and sexual exploits, as well as stories of parental "discipline" that Mr. Crowe had shared concerning his own son. As the rule docket reflects, the divorce litigation restarted due to Dr. Langer's concerns, after more than six years of relative peace.

| | | | | | |
|---|---|---|---|---|---|
| 10/29/2019 | SUMMONS ISSUED TO ATTORNEY (SMAI) | | 1 | 1 | 8.00 |
| 10/29/2019 | COST BOND-SURETY (CB) | | 1 | 1 | 0.00 |
| 10/29/2019 | PETITION (PET) | MODIGY PPP/CS | 1 | 1 | 75.00 |
| 10/29/2019 | INDEXING, JUDG. FOR COSTS, & TJIS (IJTJ) | | 1 | 1 | 0.00 |
| 10/29/2019 | DATA ENTRY (DA) | | 1 | 1 | 4.00 |
| 06/17/2013 | FIFA (FIFA) | | 1 | 1 | 0.00 |
| 06/17/2013 | COST AGAINST | BOTH PARTIES | 1 | 1 | 0.00 |
| 06/17/2013 | NOTICE OF ENTRY (NOE) | | 2 | 1 | 0.00 |

Indeed, Dr. Carver and her parents traveled with Dr. Langer, Mrs. Langer, and Dr. Langer's extended family to Israel for ten days only three months before the Petition to Modify was filed. The change in the relationship between Dr. Langer and Dr. Carver was due solely to the involvement of Mr. Crowe and Mr. Crowe's response to Dr. Langer's concerns for his children. The court has since awarded Dr. Langer custody at all times except Thursday nights. *See* **Exhibit C,** 10/26/2020 Custody Order. A complete rule docket is attached as **Exhibit D**, while a complete set of pleadings and orders is being provided to the Board under separate cover.

b. *Sarwar, et al. v. BMW,* **United States District Court for the District of New Jersey, No. 2:18-cv-16750.**

In approximately 2017 or 2018, Dr. Langer received a letter from a law firm indicating that he was a member of a putative class action based on his ownership of a 2014 BMW. Based on the pleadings filed by the law firm, and Dr. Langer's vague recollection, the letter recommended that he opt out of participation in the class and offered to represent him if he did choose to opt out. Dr. Langer recalls that he sent in a card with his information and agreeing to opt out of the class, and to his recollection has heard nothing further. Upon receipt of the Show Cause Order dated August 7, 2020, Dr. Langer learned for the first time that he was a party to a lawsuit against BMW in the Eastern District of Tennessee, *Langer v. BMW,* discussed below. Further investigation by Dr. Langer's counsel, including a nationwide PACER search, revealed this matter in the District of New Jersey, to which Dr. Langer was named a plaintiff. A review of

the court docket reveals that Dr. Langer was included as a plaintiff in a lawsuit on behalf of several plaintiffs in 2018 in the United States District Court for the District of New Jersey. The claims of Dr. Langer and several other plaintiffs were severed and dismissed without prejudice by an order dated November 27, 2019. Dr. Langer's claim was then re-filed in the Eastern District of Tennessee on January 24, 2020. Dr. Langer first learned about the New Jersey matter upon being informed by his counsel in December 2020. A copy of the docket is attached as **Exhibit E**. A copy of all pleadings and orders is being delivered to the Board under separate cover.

    c. *Langer v. BMW,* **United States District Court for the Eastern District of Tennessee, No. 3:20-cv-37.**

Upon receipt of the Show Cause Order, Dr. Langer learned that he was named as a plaintiff in a lawsuit filed against BMW in the Eastern District of Tennessee. The lawsuit arises out of Dr. Langer's agreement to "opt out" of participation in a class action related to alleged defects in the engine of his 2014 BMW, as described above. Dr. Langer has had no involvement in the litigation beyond his agreement to participate. A copy of the docket is attached as **Exhibit F**. A copy of all pleadings and orders is being delivered to the Board under separate cover.

    d. *Miller v. Cookeville Regional Medical Center,* **Putnam County Circuit Court, No. 71CC1-2011-CV-263.**

Dr. Langer was initially named as a defendant in this lawsuit by virtue of being the CEO, but then was removed from the suit without being served with process.[7] Dr. Langer first learned that he was named in this action when he "Googled" himself while preparing his bar application.

---

[7] Because he was never served, under Tennessee law, the action was never "commenced" as against Dr. Langer, at least for some purposes. *See Davis v. Grange Mut. Cas. Grp.,* 2017 Tenn. App. LEXIS 646, *10 (Tenn. Ct. App. 2017) (explaining that filing and service required for action to be commenced for limitations purposes).

The final order, which does not mention Dr. Langer since he was never served, is attached as **Exhibit G**. A copy of the docket and all pleadings will be provided to the Board under separate cover.

### e. *Langer v. Sun Life,* Knox County Chancery Court, No. 187655-1.

Following Dr. Langer's transition from CEO to Executive Consultant at CRMC, CRMC was obligated by contract to continue Dr. Langer's employment benefits – including insurances – through December 31, 2015. When Dr. Langer suffered a relapse of MS during that time, he applied for benefits and learned that CRMC had not fulfilled its obligation. Dr. Langer sued CRMC for breach of its contract with him, and sued Sun Life for benefits. It was during this period – when he was working for CRMC as an executive consultant – that he gave his deposition in which he testified about his physical and cognitive symptoms, as mentioned in the Show Cause Order. The matter settled and Dr. Langer received the benefits to which he was entitled. A copy of the rule docket is attached as **Exhibit H**. A copy of all pleadings and the final order of dismissal will be provided to the Board under separate cover.

### f. *Langer v. Howl,* Putnam County General Sessions Court, No. 0431C12.

Dr. Langer filed this matter alleging that his landlord had refused to return his security deposit. After filing suit, the security deposit was returned and the matter was dismissed. A copy of the pleading and final order will be submitted to the Board under separate cover.

### g. *Langer v. Crowe,* Loudon County General Sessions Court, No. 2020-DV-28.

Daniel Crowe's threatening and abusive statements to Dr. Langer, combined with knowledge of Mr. Crowe's possession of multiple guns and automatic weapons, caused Dr. Langer to fear for his safety. Dr. Langer sought and obtained an Order of Protection. A docket

report together with a complete set of pleadings and final order will be submitted to the Board under separate cover.

    h. *Langer v. D&M Gate,* **Loudon County General Sessions Court, No. 19-cv-58.**

Dr. Langer hired D&M Gate to install a gate opener, which did not function as warranted. D&M Gate refused to honor the warranty, and Dr. Langer brought a claim in General Sessions Court. The court found in favor of Dr. Langer, and D&M Gate is in the process of paying the resulting judgment. A copy of the pleading and final order will be submitted to the Board under separate cover.

  **2. "Profane, combative and sometimes threatening" communications.**

It appears that this allegation in the Show Cause Order is due to a mis-reading of text messages submitted by Mr. Crowe and/or Dr. Carver. A portion of the text messages between Dr. Langer, Jill Langer, and Mr. Crowe, as received from the Board, is included as **Exhibit I** with the author of each message annotated in red. While the relationship between Dr. Langer, on the one hand, and Dr. Carver and Mr. Crowe, on the other, was very tense in late 2019, that was a marked departure from the relationship that Dr. Langer had with Dr. Carver up through July 2019 when their families vacationed together in Israel. Prior to that point, the worst that could be said of the relationship between Dr. Carver and Dr. Langer was that it was marked by the type of petty bickering and name-calling common to divorced parents who may not like each other much but have to jointly raise children nonetheless. They were not always kind to each other, but they managed to get along with each other in managing the upbringing of their children. The markedly increased stress in the relationship experienced in late 2019 was caused by Dr. Langer's concern for the safety and well-being of his children in a house with Mr. Crowe and the overt hostility instigated by Mr. Crowe. Understood in this context, the messages from Dr.

Langer are relatively benign, and downright tame compared to the toxic vitriol sent by Mr. Crowe.  Dr. Langer respectfully submits that the Show Cause Order is incorrect with regard to the alleged "profane, combative, and sometimes threatening" nature of his communications, and likely mistakenly credited him as the author of Mr. Crowe's messages.  Dr. Langer will be happy to respond further to the Board's concerns in this regard at the hearing.

   **3. Deposition testimony regarding cognitive dysfunction and physical disability.**

Dr. Langer suffered a relapse of MS in late 2012.  His symptoms were cognitive impairment marked by cognitive dysfunction including slowed processing and short-term memory issues, balance, numbness, and tingling.  His symptoms, as described in his deposition testimony, were not subjective:  they were verified by neuropsychological testing and confirmed in writing.  A copy of a medical evaluation dated 2013, from the International Multiple Sclerosis Management Practice in New York is attached as **Exhibit J**, and a statement by Dr. Sadiq is attached as **Exhibit K**, both of which are in the Board's file but are included here for the convenience of the Board.[8]  Dr. Langer's symptoms began to lessen by mid-2014 and were substantially in remission by mid-2015.  Remission of his disease allowed Dr. Langer to consider, apply for, and enter law school.

At the request of the Board, followed by instructions for TLAP, Dr. Langer reported to the Multidisciplinary Comprehensive Assessment Program (MCAP) of Chicago for three days of in-person evaluation of his fitness for duty.  The MCAP report, dated October 2020, notes that "[t]here were no cognitive defects detected or pattern of neuropsychological dysfunction related to Multiple Sclerosis noted. . . ."  A copy of the report is attached as **Exhibit B** and concludes that "Dr. Langer should not be restricted from practicing law…."

---

[8] A copy of a deposition of Dr. Sadiq is in the Board's file, in which Dr. Sadiq confirms Dr. Langer's diagnosis in 2012-2013 and describes periods of "active" versus "inactive" disease, relapses and remission.

**4. CRMC Employment: termination for cause and "provided no services."**

As described above, Dr. Langer worked as CEO/COO until October 31, 2012, then began a position as Executive Consultant on November 1, 2012. His employment with CRMC ended in January 2015 when the term of his contract as Executive Consultant ended. A written submission from CRMC to NCBE includes several statements that appear to be in conflict with these facts:

- "Dates are correct, though no services provided as 'executive consultant.'"
- "Terminated for cause."
- "Mr. Langer was terminated for cause on October 31, 2012. . . ."

**a. Negotiation with Chairman**

Pursuant to CRMC policy, approved by the CRMC Board, it was the duty of the Chairman of the Board to review the CEO and negotiate his contract. In later litigation with Sun Life, it was established that Dr. Langer fulfilled his obligations, but that the Chairman did not keep the other Board members informed about Dr. Langer's contract. Judge Steven Qualls, prior to being a judge, was on the Board of CRMC and testified in the Sun Life litigation about the roles of Dr. Langer, on the one hand, and the Chairman, on the other. He testified unequivocally that Dr. Langer acted appropriately, in accordance with his contract and CRMC policies, and that the Chairman also acted within his authority. In short, Dr. Langer did exactly what he was supposed to do. Dr. Langer may present portions of that extensive deposition testimony at the hearing in order to address specific questions or concerns raised at that time.

**b. Termination "for cause"**

The end of Dr. Langer's position as CEO of CRMC in 2012 was initially stated to be "for cause," but this was disputed by Dr. Langer and reversed by written agreement between Dr.

Langer and CRMC. A true copy of the agreement between CRMC and Dr. Langer signed by the parties is attached as **Exhibit L**. Pursuant to the written agreement dated December 2012, Dr. Langer's position was changed from CEO to Executive Consultant. As explained in sworn testimony by Angela Lewis, CRMC's Senior Vice President for Human Relations, Dr. Langer did not have to fill out an application for his position as Executive Consultant because his employment with CRMC had not ended:

```
12   Q.      And what is this document?
13   A.      The application for employment.
14   Q.      By Dr. Langer?
15   A.      Yes.
16   Q.      And this is dated September 15, 2010; is that
17   correct?
18   A.      Yes.
19   Q.      So is that about when he would have completed
20   it?
21   A.      Yes.
22   Q.      And did he complete a new application for
23   employment when he became a consultant?
24   A.      No.
25   Q.      Would that be the normal course of things, to
```

```
1   have him do that when he became a consultant?
2   A.      No.
3   Q.      You don't have folks complete a new
4   application when they change jobs?
5   A.      No.
```

His term as Executive Consultant began the day after his position as CEO/COO ended, for a defined term to January 2015, with salary and benefits through December 2015. For this reason, the statement submitted to the Board by CRMC is incorrect in its assertion that Dr. Langer was terminated "for cause," and is a violation of the non-disparagement provisions of the contract.[9] By contrast, Dr. Langer noted accurately on his application that his position as CEO ended due to a "contract dispute." His position as Executive Consultant ended because it was a contract for a limited term and concluded according to its terms.

    c. **"Provided no services"**

As noted above, a contract between Dr. Langer and CRMC specified that Dr. Langer would provide Executive Consultant services as requested, and for which he was paid without regard to whether any such services were ever requested. Indeed, the contract specifies that his services could be initiated only by request from CRMC's CEO. No services were requested of him and he was disabled for a substantial portion of the term of his position due to a relapse of his MS. For this reason, the CRMC submission to NCBE correctly notes both (i) that the dates of his position as Executive Consultant are correct; and (ii) that he never provided any services as Executive Consultant.

---

[9] The person who signed CRMC's submission to the NCBE was not employed at the hospital in late 2012, and most likely reconstructed the statements on the submission from incomplete documentation.

## 5. LinkedIn page holding himself out as "attorney," employed as a partner with Langer Law Group, RPC 5.5 and TCA 23-3-103

As described above, Dr. Langer worked with his father, now deceased, and his sister, attorney Erris Langer Klapper, to establish Langer Healthcare Consulting LLC. A copy of the firm's web page is in the Board's files and attached as **Exhibit M** for the Board's convenience. Dr. Langer was not described as an attorney on that page. The business was not as profitable as they would have liked, in part because the firm was forced to engage attorneys to provide the services that its clients needed. This contributed to Dr. Langer's decision to attend law school. The business slowed after the death of Dr. Langer's father and Dr. Langer's entry into law school, but has not ended. Upon admission to the bar, Dr. Langer plans to resuscitate the family business with his sister.

Dr. Langer was authorized to practice law in Tennessee pending admission upon examination, pursuant to Tenn. Sup. Ct. R. 7, § 10.04, under the supervision of a licensed attorney. Upon learning that he passed the bar in April 2020, Dr. Langer changed his LinkedIn page to identify the business as a "Law Group," with himself as a "partner." While he did not explicitly identify himself as an attorney, he acknowledges that he may have implicitly identified himself as an attorney before he was licensed because he could not legally have been a partner in a law firm without being an attorney. Dr. Langer acknowledges that this was a mistake notwithstanding that he was authorized to practice under supervision.

## DISCUSSION

Tennessee Supreme Court Rule 7, § 6.01, is titled "Character and Fitness Standard," and defines the standard to be applied by the Board in evaluating any applicant for admission to the bar. The rule states:

> (a) An applicant shall not be admitted if the Board finds reasonable doubt as to that applicant's reputation, character, honesty, respect for the rights of others, fitness to practice law, and adherence to and obedience to the Constitution and laws of Tennessee and the United States and concludes that such applicant is not likely to adhere to the duties and standards of conduct imposed on attorneys in this State. Any conduct which would constitute grounds for discipline if engaged in by an attorney in this State shall be considered by the Board in making its evaluation of the character of an applicant.

This is the only standard applicable to bar applicants, because "[e]xcept as expressly provided in this Rule, the Board has no power to waive or modify any provision of this Rule." Tenn. Sup. Ct. R. 7, § 12.12.

> The Board or any individual member, as part of the character investigation of an applicant, may request an applicant to submit to a drug or alcohol screening test or be referred to the Tennessee Lawyers Assistance Program (TLAP) for evaluation under Tennessee Supreme Court Rule 33.05(E)(3).

Tenn. Sup. Ct. R. 7, § 6.04(d).

In this case, a supreme attempt has been made to impugn Dr. Langer's character. However, each facet of the attack fails upon closer examination of the record. Despite the challenges he has faced with his disease, Dr. Langer has achieved far beyond the capacity of most people, with three degrees and two children entrusted to his care by the court. He has submitted himself to three days of in-person evaluation in Chicago – most of which was tailored toward substance abuse issues – notwithstanding no record or history of substance abuse. He has engaged in no conduct that would warrant discipline under the Rules of Professional Conduct, and there is no room for reasonable doubt as to his reputation, character, honesty, respect for the rights of others or fitness in any other respect.

Dr. Langer anticipates presenting multiple witnesses and further evidence at the hearing of this matter to further establish his character and fitness, and welcomes further questions from the Board in advance of the hearing or at that time.

## CONCLUSION

Based on the foregoing, the Applicant, Menachem Langer respectfully requests that the Board approve his application for admission to the Bar.

Respectfully submitted,

*signature*

Gregory Brown [BPR # 027944]
Lowe Yeager & Brown PLLC
900 S Gay St Ste 2102
Knoxville, TN 37920
(865) 521-6527
gb@lyblaw.net
*Attorney for Applicant*

## VERIFICATION

I have reviewed the facts stated in the foregoing document and affirm under the pains and penalties of perjury that they are true and correct and, except where indicated otherwise, are known to be such of my own personal knowledge.

*signature*
Menachem Langer

20