EXHIBIT F

SUPREME COURT OF TENNESSEE
BOARD OF LAW EXAMINERS

IN RE:

    MENACHEM LANGER,                    Docket No. 20-18

    Applicant.

## POST-HEARING BRIEF

The Applicant, Dr. Menachem Langer, appreciates this opportunity to address concerns raised by the Board in the Show Cause Order. Since the hearing, Dr. Langer has submitted a sworn declaration from attorney John Dupree, in order to address some questions from the Board during the hearing. Although Dr. Langer is hopeful that the evidence to date, together with the discussion herein, has addressed all of the Board's concerns, he is willing to participate in further hearings and/or provide further information if the Board deems it helpful.

Many of the Board's questions at the hearing seemed to focus on the time period from 2012 through 2017, during which Dr. Langer (1) left his position as CEO of CRMC; (2) served as a consultant for CRMC; (3) suffered a relapse of multiple sclerosis; (4) sued to receive disability benefits; and (5) entered law school. There are a few different apparent contradictions in this time period:

- Dr. Langer was "employed" as a consultant, but "provided no services."
- Dr. Langer was disabled, within the meaning of a disability insurance policy, but was being paid as an employed consultant of CRMC.
- Dr. Langer was disabled, within the meaning of a disability insurance policy, but started his consulting business.

1

- Dr. Langer was seeking disability benefits, but then started and completed law school.

When the facts are understood, none of these are actual contradictions. Rather, they are all true when the sequence of events and the nuances of definitions (e.g., "employed") are understood.

1. **Facts**

Dr. Langer moved to Tennessee in 2010 and began his position at Cookeville Regional Medical Center in October 2010. (CRMC NCBE Verification). In early 2011, he was promoted from Chief Operating Officer to Chief Executive Officer. (Tr. 90:3-8). The contract specified that (a) he would be evaluated each year, and (b) that amendments would be agreed upon between the CEO and the Chairman of the Board.

The amendment process was the same as the process used with the prior CEO. A copy of a contract amendment dated September 27, 2010, between CRMC and the prior CEO, Bernard Mattingly, and CRMC is attached as **Exhibit A**. It was signed by the CEO and Chairman Qualls and amended the contract to increase the CEO's salary. Similarly, Dr. Langer and CRMC met and executed an amendment dated October 18, 2011, signed by the CEO and Chairman. A copy of this amendment is attached as **Exhibit B**.

In early 2012, Dr. Langer met with the Chairman of the Board for his evaluation. Dr. Langer proposed a salary increase that was based on the mid-point between the 50th and 75th percentiles for regional hospitals like CRMC. A copy of the February 21, 2012, amendment is attached as **Exhibit C**. *The same form was used as had been used previously with Dr. Langer <u>and</u> with the CEO before Dr. Langer because this was CRMC's procedure, not Dr. Langer's.* The Chairman agreed to the new terms and executed Dr. Langer's contract, just as he had executed the prior amendment of Dr. Langer's contract, and just as Judge Qualls had executed

2

the amendment of the prior CEO's contract. (Tr. 91:24-92:11). A couple weeks later, the Chairman requested and obtained a copy of that contract amendment. (Tr. 135:4-9).

Notably, the amendment with Mr. Mattingly increased his salary without any indication of how the new salary was determined. Dr. Langer's proposal, that was accepted by the Chairman, was to peg his salary to the mid-point between the 50th and 75th percentiles on reported salaries for similarly sized medical centers. This was <u>not</u> an unreasonable measure of a reasonable salary for the position.

CRMC later claimed that the contract amendment should have been approved by the Board of Trustees. However, Steven Qualls, formerly the Chairman of the Board and now a judge in Putnam County, testified that Board approval was something that Chairman Huffines was supposed to do. The amendment between CRMC and Bernard Mattingly, the former CEO, was signed by Mr. Mattingly and Chairman Qualls without any indication of how or when that was discussed with the CRMC Board. Similarly, the October 2011 amendment between CRMC and Dr. Langer was signed by Dr. Langer and Chairman Huffines without any indication of how or when that was discussed with the CRMC Board. Judge Qualls testified unequivocally that Dr. Langer did what he was supposed to do, and the duty to discuss it with the Board was on the chairman:

> Q. Are you aware of any way that Dr. Langer breached his duty of loyalty or good faith and fair dealing with the hospital?
>
> A. Pursuant to the terms of this contract, I think he acted within his contract. I think it was obvious that any increase in salary should have been discussed with board members, and that was not done. That is one – that is the main issue, I think, that I knew of.
>
> Q. Who had the duty to discuss a salary increase with the board, Dr. Langer or the chairman of the board?
>
> A. The chairman of the board would have done that. . . .

> Q. And then apparently Mr. Huffines did not take this matter to the board, the raise that Dr. Langer got?
>
> A. Correct.

(Qualls Depo. 17:11-22, 18:5-8).

It was no secret that Dr. Langer had been given a raise: the documents went to Human Resources, who implemented the raise, just as they had the raise for Mr. Mattingly two years prior. But since the chairman did not discuss it with the Board as he should have, it was a surprise to them when they learned what the chairman had done nearly eight months later. In an apparent race to "save face," they blamed Dr. Langer, not the chairman, and voted 7-2 to terminate him. Initially, the Board purported to terminate Dr. Langer "for cause" for the chairman's failure to communicate with the Board. Attorneys for Dr. Langer and an attorney for CRMC then corrected the unlawful termination, removing the "for cause" reference and giving Dr. Langer a substantial settlement for the wrongful termination. As CRMC's attorney was quoted as saying in the press, "He [Dr. Langer] did not breach his original contract."

The settlement with CRMC gave Dr. Langer employment as a consultant through 2014, with lump sum salary payments and benefits.[1] It was "employment," but services were to be provided by Dr. Langer only at the request of the CEO.[2] The press reported, "Although unwritten, it's assumed that the arrangement is basically a formality and no work is expected to be assigned." (Pearson-Taylor Decl.). This is in fact what the contract said.[3] In fact, the agreement itself stated that Dr. Langer could terminate his employment at any time, but would *still* receive the payments: they would merely be recharacterized as severance instead of salary:

---

[1] "CRMC wishes to employ and Dr. Langer accepts employment as a consultant." (Agreement and Release ¶ 2(a), attached to Pearson-Taylor Decl.).
[2] "Both parties acknowledge that the services under this contract can be initiated with Dr. Langer only through and by the CEO of CRMC." (Agreement and Release ¶ 2(a), attached to Pearson-Taylor Decl.).
[3] "The compensation described in this section shall be paid regardless of the frequency with which Langer's services are engaged." (Agreement and Release ¶ 2(a), attached to Pearson-Taylor Decl.).

> Dr. Langer may terminate his employment as consultant at any time upon written notice to CRMC. In the event that Dr. Langer terminates his employment with CRMC, the payments set forth in paragraph (a) above shall be converted to severance compensation. . . . Dr. Langer agrees that he will no longer be entitled to health, life or disability insurance coverage . . . after his employment with CRMC terminates.

(Agreement and Release ¶ 2(e), attached to Pearson-Taylor Decl.). Since Dr. Langer would be paid regardless of whether he continued or terminated his employment with CRMC, the only real effect of continuing his employment was the provision of benefits.



Those benefits turned out to be critical for Dr. Langer, as the stress of his termination and simultaneous divorce triggered a substantial relapse of his multiple sclerosis in late 2012. Dr. Langer was not seeking to be disabled. Although suffering from the symptoms of his relapse, he tried (and failed) to start his own consulting firm. (Dupree Decl. ¶ 5). Secretary of State documents show that Langer Healthcare Consulting LLC was created on May 28, 2013, six months after his relapse began, but by November 2013 he was in New York for evaluation by neurologists who noted that he had been unable substantially to work for about a year.[4] Finally admitting defeat in his effort to keep working, Dr. Langer filed for disability benefits in the spring of 2014. When those benefits were denied due to in-fighting between CRMC and the insurance company, he filed suit on July 10, 2014, represented by Knoxville attorney John Dupree. (Dupree Decl.).

---

[4] Although he had a few clients, the consulting business never really got off the ground: the Secretary of State website shows that Langer Healthcare Consulting, LLC, was inactive as of August 8, 2015.

CRMC considered Dr. Langer to be employed, and Dr. Langer had expressly agreed to be employed, but Sun Life's policy said that an employee had to be working "full-time" to qualify for coverage. Ultimately, that led to Sun Life's dismissal from the lawsuit. (Dupree Decl. ⁋ 7).

As noted in the Declaration of John Dupree, once Sun Life was dismissed from the litigation, CRMC came up with a slew of new theories about why they should not be required to fulfill their contractual obligations to provide disability benefits to Dr. Langer. (Dupree Decl. ⁋ 8). In Mr. Dupree's opinion, "none of CRMC's theories were substantially supported by the evidence," and Mr. Dupree was optimistic that Dr. Langer would be successful in recovering benefits.

However, the key to receiving benefits under the lawsuit was Dr. Langer's continued disability. While his condition and symptoms were well documented by doctors (and noted by Mr. Dupree, per his declaration), Dr. Langer's condition did begin to improve in late 2016 into 2017. At some point, he felt well enough that he no longer wanted disability benefits into the future, but preferred to continue his career. At Dr. Langer's instruction, Mr. Dupree negotiated a settlement that reflected the benefits Dr. Langer should have received prior to the remission of his symptoms, but gave up Dr. Langer's future entitlement to benefits. (Dupree Dec. 11-12).

Dr. Langer was admitted to the Duncan School of Law at Lincoln Memorial University for the fall term of 2017. While he did not initially request any accommodation for his multiple sclerosis, his first mid-term exams made it clear that he would require an accommodation.[5] The school granted him an accommodation. He successfully completed the program in two and a half years, was on the Dean's Council, and was well known to the Dean of the Law School, former Justice Gary Wade.

---

[5] John Dupree's observations regarding the impact of multiple sclerosis on Dr. Langer's cognitive functioning are illuminating. *See* Dupree Decl. ⁋ 10.

6

Case 3:22-cv-00138-TRM-JEM   Document 1-6   Filed 04/18/22   Page 6 of 16   PageID #: 84

## 2. Dr. Langer did not misrepresent his consulting position at CRMC.

The Board asked several questions that focused on Dr. Langer's position as a consultant at CRMC, his description of that position on his resume, and related issues. As quoted above, the contract between Dr. Langer and CRMC specifically said that he was being "employed" as a consultant. Given the character of that agreement as a settlement intended to compensate Dr. Langer for his wrongful termination, he was expressly to be paid without regard to whether the CEO ever called upon him to work: "The compensation described in this section shall be paid regardless of the frequency with which Langer's services are engaged." (Agreement and Release ¶ 2(a), attached to Pearson-Taylor Decl.). And, in fact, he would still be paid if he terminated his employment, but then he would not be entitled to benefits. (Agreement and Release ¶ 2(e), attached to Pearson-Taylor Decl.).

Given the existence of the contract, it would have been misleading for Dr. Langer to omit that experience from his resume and his law school and bar applications. If he had left the position off of his resume, the Board could have pointed to Dr. Langer's contract with CRMC and rightly questioned why he had "not disclosed" his employment. This is a Catch-22 that cannot be held against Dr. Langer: disclose the position and be accused of misrepresenting his experience or not disclose the position and be accused of concealing an employment position.

In short, the fact that Dr. Langer did not provide services does not lessen the truth of his employment: his contract with CRMC said he was employed, and he was paid. An analogy could be given for a fireman who is on duty but never has to fight a fire. Or doctors who are paid to be on call for a period of time even though they never see a patient. Simply put, Dr. Langer's employment did not require anything of him beyond his availability, and that was what his contract with CRMC indicated.

7

It should be noted that Dr. Langer's ensuing disability during the term of his consultant contract involved no misrepresentation or duplicity. If he had been called upon to provide services, his disability may have created a problem. In that circumstance he might have breached his agreement if he could not provide the promised services. Faced with that dilemma, he would have had the option to terminate the agreement and collect his pay nevertheless. But that situation never occurred. He fulfilled every obligation that he had under the contract, never breached it, never required any accommodation for his disability, and – importantly – was not being paid for employment during the same period he was collecting disability benefits.

**3. Dr. Langer did not conceal or misrepresent his condition.**

The idea that Dr. Langer had a duty to disclose his multiple sclerosis is a theory that CRMC came up with late in the litigation over Dr. Langer's disability coverage. (Dupree Decl. ¶ 8). Dr. Langer's attorney, who was tasked with defending against those allegations, has presented his sworn declaration that those theories were not "substantially supported by evidence," and that he expected Dr. Langer to prevail against those unsupported allegations. (Dupree Decl. ¶ 8). In short, those allegations were a litigation tactic, a mere argument presented by CRMC to avoid paying benefits.

The reality is that Dr. Langer never had to disclose his multiple sclerosis because, unless he requires an accommodation from his employer, it is none of the employer's business under the Americans with Disabilities Act. In the absence of a requested accommodation, the employer cannot ask about disabilities, and the employee need not tell. 29 CFR § 1630.13. Judge Qualls testified:

> Q. You didn't ask about medical conditions when you were negotiating [Dr. Langer's CEO contract] with Dr. Langer?
>
> A. No. I would not have asked him about his medical condition at that time. He seemed to be – I mean, obviously, seemed to be very competent and

8

> healthy and was physically able to do the job. And we had witnessed that for some time, so there would be no reason for me to ask that.
>
> Q. Were you aware of any negative employment evaluations in Dr. Langer's personnel file prior to his termination as CEO in 2012?
>
> A. No.

(Qualls Depo. 16:19-17:5).

**4. Unsubstantiated allegations aside, Dr. Langer has a spotless record.**

Dr. Langer has no arrests, no student discipline, no adverse judgments, no bankruptcies, not even a speeding ticket. He has had a career as a hospital administrator and consultant, and been involved in litigation – all of which was resolved in his favor if it was resolved at all. He suffers from a sporadically crippling disease, but has obtained three degrees notwithstanding and has the strong support of the Dean of his law school, as described below. There are only four potentially negative things in his life, none of which are credibly negative when given scrutiny:

- Allegations surrounding his termination from CRMC – which, when challenged, resulted in a large settlement payment to him and removal of the "for cause" language.

- Allegations by his ex-wife and Mr. Crowe – but the court has ruled in Dr. Langer's favor and shifted custody of his children to Dr. Langer.

- Allegations by CRMC in litigation to avoid paying disability benefits – which resulted in a settlement in Dr. Langer's favor.

- The Show Cause Order, which resulted in a fitness-for-duty evaluation that "Dr. Langer should not be restricted from practicing law. . . ."

**5. Judge Wade's testimony in support of Dr. Langer's admission should be given deference.**

Judge Gary Wade is a former justice of the Tennessee Supreme Court, an attorney licensed since 1973, and the Dean of the law school from where Dr. Langer graduated. (Tr. 17:4-15). Dr. Langer was "one of the more exceptional students that [Judge Wade] had a more meaningful period of time with." (Tr. 23:6-7). He recalls speaking with Dr. Langer at least once

a week over the two and a half years that Dr. Langer was a student, sometimes passing in the hallway, sometimes sitting in his office. (Tr. 18:11-17). Dr. Langer served on the Dean's Council, as well. Judge Wade was aware of Dr. Langer's prior litigation with CRMC, as that was considered prior to admitting him to the law school (Tr. 26:20-27:19). Judge Wade testified as to Dr. Langer's character and fitness, and opined that Dr. Langer is an attorney that Judge Wade would hire to represent him. (Tr. 18:18-19:11). In short, he supports Dr. Langer's application for admission to the bar. (Tr. 21:1-17).

6. **The Board should not impose conditions on Dr. Langer's admission because the conditions recommended in the fitness-for-duty report are not narrowly tailored to address any concerns that the Board may have. Nevertheless, Dr. Langer will defer to the judgment of the Board and accept any condition imposed by the Board.**

The Board's authority to impose conditions on an applicant's admission to the bar is not unlimited. Tenn. Sup. Ct. R. 7, § 10.05, describes and delimits that authority. In pertinent part, it states:

> An applicant whose previous conduct or behavior would or might result in a denial of admission may be conditionally admitted to the practice of law upon a showing of sufficient rehabilitation and/or mitigating circumstances. The Board shall recommend relevant <u>conditions relative to the conduct or the cause of such conduct</u> with which the applicant must comply during the period of conditional admission.
>
> (a)    Conditions. The Board may recommend that an applicant's admission be conditioned on the applicant's complying with conditions that are <u>designed to detect behavior that could render the applicant unfit to practice law and to protect the clients and the public</u>…. The conditions shall be <u>tailored to detect recurrence of the conduct or behavior which could render an applicant unfit to practice law</u> or pose a risk to clients or the public and to encourage continued abstinence, treatment or other support. The conditions should be <u>established on the basis of clinical or other appropriate evaluations</u>. . . .

(emphasis added).

Dr. Langer was subjected to three days of clinical examination and testing in Chicago as a condition to admission to the bar. The resulting report confirms that Dr. Langer has zero

10

substance abuse history or issues. He has "normal cognitive functioning," with "no cognitive deficits detected or pattern of neuropsychological dysfunction related to Multiple Sclerosis noted…." (MCAP p. 7). His medical diagnoses include multiple sclerosis, hypertension, and that he takes diet pills. (MCAP p. 10-11). "[H]e did not meet criteria for any Axis I diagnosis except for an unspecified anxiety disorder diagnosed during his divorce proceedings ins 2012/2013.... Dr. Langer has been prescribed an antidepressant since 2012/2013 for anxiety...." The report concluded that "Dr. Langer is advised to engage in regular (weekly) insight-oriented psychotherapy with a therapist approved by TLAP," but does not tie such recommendation to any clinical diagnosis.

The Show Cause Order required a fitness-for-duty evaluation for Dr. Langer, which resulted in his presentation for the MCAP in Chicago. In a strangely circular fashion, the MCAP report states: "An impactful document was the Show Cause Order (2020). . . ." (MCAP p. 14). Based on their review of the Show Cause Order, the doctors suggested additional treatment recommendations, including:

- Individual psychotherapy. The report included no diagnoses other than unspecified anxiety dating back to 2012/2013 when he was both going through a divorce and being wrongfully terminated.

- Monitoring by TLAP. Notably, this recommendation does not say <u>what</u> TLAP should be monitoring for, as there are no diagnoses, abuse histories, or other concerns except the questions raised in the Show Cause Order.

- Continued Efforts Toward Wellbeing. Dr. Langer should transfer his neurological care from the world-renowned MS specialist in New York that has been treating Dr. Langer since 2009 to a local center, and update his blood pressure medication.

11

- Attention to Professionalism to Include PMP Monitoring for Accountability. Dr. Langer tested negative for all controlled substances – even after they shaved two large stripes up his chest to take hair samples.
- Marital/Family Therapy. This is somewhat consistent with Dr. Laurence's opinion that counseling could be "medically beneficial," though not "medically necessary."
- Psychiatric Consultation. Because he has been prescribed an antidepressant for anxiety since 2012/2013, he should "consult with a psychiatrist approved by TLAP."

In order for the Board to impose conditions on Dr. Langer's admission, the rules require that the Board first identify conduct that could result in a denial of admission. Then, based on "clinical evaluations," the Board tailor the conditions to detect recurrence of the conduct or behavior that could render him unfit. *See* Tenn. Sup. Ct. R. 7, § 10.05(a). The problem with the treatment recommendations in the MCAP is that <u>none</u> of them are "relative to the conduct or the cause of . . . conduct" that would prevent his admission to the bar. *See* Tenn. Sup. Ct. R. 7, § 10.05. Again, Dr. Langer has <u>zero</u> psychiatric diagnoses except mild anxiety, and <u>zero</u> history of substance abuse. There is no evidence that his anxiety, high blood pressure or multiple sclerosis caused any conduct that could prevent his admission to the bar.

Dr. Lance Laurence, who has spent much more time with Dr. Langer than the doctors who wrote the MCAP report, made clear the distinction between "medically necessary" and "medically beneficial." He verified that Dr. Langer has no impairments – to the point that he recommended that Dr. Langer be made the primary custodial parent for his children. It is respectfully submitted that before the Board can condition Dr. Langer's admission on compliance with any of the recommendations in the MCAP, it must first determine that the recommended treatment is narrowly tailored to detect recurrence of a behavior that could prevent

his admission. None of the recommended treatments satisfy that test. For this reason, the Board should not impose any of the recommended treatments as conditions on Dr. Langer's admission. Nevertheless, as stated at the hearing, Dr. Langer will comply with any and all conditions imposed on his admission.

## CONCLUSION

Based upon the foregoing, the materials submitted to the Board, and the evidence presented at the hearing, it is respectfully requested that Dr. Langer satisfies all of the requirements for admission to the bar and should be admitted.

Respectfully submitted,

_____
Gregory Brown [BPR # 027944]
LOWE YEAGER & BROWN PLLC
900 S Gay St Ste 2102
Knoxville, TN 37902
(865) 521-6527
*Attorney for Applicant*

4816-5074-9404, v. 1

13

# Amendment of Chief Executive Officer
# Employment Contract

This amendment to contract is entered into on the 27th day of September 2010, between **Cookeville Regional Medical Center Authority**, a Private Act Hospital Authority, (hereinafter "Authority) and **Bernard Mattingly** (hereinafter "CEO"),

WHEREAS, Cookeville Regional Medical Center entered into an employment agreement with Bernard Mattingly on December 23, 2004; and

WHEREAS, the Authority desires to adopt, amend, and extend the Contract.

NOW, THEREFORE, for good and valuable consideration, including the mutual promises and covenants contained in the original contract and further consideration, contained herein the Authority and the CEO agree as follows:

1. The Authority and the CEO adopt and ratify the December 23, 2004 Contract subject to the modifications set forth herein.

2. Paragraph 2 of the Contract is deleted in its entirety and there is substituted therefore the following:

    a. In consideration of these services as Chief Executive Officer, the Authority agrees to pay the CEO a salary of **$389,000.00**. The Board of Trustees shall agree upon measurable indicators on an annual basis. An annual review (hereinafter "Annual Review") shall occur each year within eleven (11) months of the prior Annual Review. The Salary shall be payable in equal monthly installments through the term of the Contract.

3. The Agreement shall have an anniversary date of September 27th each year, commencing September 27, 2010. The term of the Agreement shall be two years from that date.

4. All other terms and conditions of the Contract remain unchanged. Agreed to by the parties this 27th day of September 2010.

COOKEVILLE REGIONAL MEDICAL CENTER AUTHORITY

By: _____
Bernard Mattingly, CEO

CHAIRMAN BOARD OF TRUSTEES

By: _____
Steven D. Qualls

Exhibit A

# EMPLOYMENT CONTRACT AMENDMENT

This Amendment is to the Employment Agreement entered into by and between Menachem Langer, M.D. ("CEO") and Cookeville Regional Medical Center Authority, ("Hospital").

Whereas, CEO and Hospital entered into an employment Agreement effective May 1, 2011

Whereas, Hospital desire to amend said Agreement,

Now therefore the parties enter into the following Amendment:

1. The following new paragraph is added as 4. g.

    4. g. Hospital will provide, at its sole, expense an annual identity theft policy up to 1 Million Dollars in coverage so long as it is required that the CEO provides his social security number (SSN) to any managed care applications, including Medicare and or TennCare. Additionally said policy will be continued for seven years from the date of the last application in which the CEO must provide his SSN, even if such seven years goes beyond the termination of the CEO's employment.

2. All the defined terms used and not otherwise defined in the Amendment shall have the meaning giving to them in the Agreement. All other provisions of the Agreement shall remain in full force and effect as on the date hereof. To the extent the Amendment is inconsistent with the Agreement, the Amendment shall control.

Signed and agreed to this _18_ day of October, 2011 by the undersigned parties.

CEO                      HOSPITAL

~~Exhibit B~~

# Amendment of Chief Executive Officer

# Employment Agreement

This shall constitute an amendment to the contract, entered into on April 13th, 2011 (hereinafter "Contract") between Cookeville Regional Medical Center Authority, a Private Act Authority, (hereinafter "Authority") and Menachem Langer (hereinafter "CEO").

WHEREAS, Cookeville Regional Medical Center entered into an employment contract with Menachem Langer on April 13th 2011; and

WHEREAS, the Authority desires to adopt, amend, and extend the Contract.

NOW, THEREFORE, for good valuable consideration, including the mutual promises and covenants contained in the original contract and further consideration, contained herein the Authority and the CEO agree as follows:

1. The Authority and the CEO adopt and ratify the April 13th 2011 Contract subject to the modifications set forth herein.
2. Number two page one of the Contract is deleted in its entirety, and the following is substituted:
    a. In consideration of services as CEO, the Hospital agrees to pay the CEO a Salary of Four Hundred and Seventy Five Thousand dollars, per annum. An annual review (hereinafter "Annual Review") shall occur each year within Eleven (11) months of the prior Annual Review. The CEO's salary shall be increased upon the anniversary date of the one year extension. The increase in salary will be calculated based on Sullivan Cotter and Associates' latest survey of hospitals whose net revenue falls between 150 million to 400 million. The salary will be adjusted at each renewal so that the CEO's salary will fall at the mid-point of the fiftieth and seventy fifth (50%-75%) percentile of the Sullivan Cotter and Associates' survey for Total Cash Compensation. The Salary shall be payable in twenty six (26) equal biweekly installments throughout the term of the contract.
3. The agreement shall have an anniversary date of May 1st each year. The first increase will take place on May 1st 2012. Subsequent increase shall take place on May 1 of subsequent years. In the event that the increase is not made on May 1st it shall be retroactive to that date.
4. This agreement serves as the extension of an additional year pursuant to number three page one of the original contract.
5. All other terms and conditions of the Contract remain unchanged. Agreed to by the parties this 21st day of February 2012.

COOKEVILLE REGIONAL MEDICAL CENTER AUTHORITY

By: _____

Menachem Langer, M.D. MBA

CHAIRMAN BOARD OF TRUSTEES

By: _____

Drue Huffines

Exhibit C