EXHIBIT H

BEFORE THE TENNESSEE BOARD OF LAW EXAMINERS

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **MENACHEM LANGER,** | ) Docket No. 20-18 |
| | ) |
| **Applicant.** | ) |
| | ) |

## ORDER RESOLVING SHOW CAUSE ORDER

This matter came before the Board pursuant to its August 7, 2020 Show Cause Order, wherein the Board raised questions about whether Tennessee bar applicant Dr. Menachem Langer ("Dr. Langer" or the "Applicant") possesses the requisite character and fitness for admission to the Tennessee bar. Having carefully considered the record evidence and arguments of counsel, and for the reasons explained in this Order, the Board concludes that there is a reasonable basis for substantial doubt that Dr. Langer has the requisite character and fitness to adhere in the future to the standards of conduct required of attorneys in Tennessee. Accordingly, Dr. Langer is denied admission to the Tennessee bar.

**I.     Procedural Background**

After graduating from Duncan School of Law at Lincoln Memorial University, Dr. Langer passed the Tennessee bar exam. Due to questions about Dr. Langer's character and fitness to practice law, the Board issued its Show Cause Order dated August 7, 2020. Dr. Langer was subsequently referred for a medical evaluation by the Tennessee Lawyers Assistance Program. The voluminous record relating to Dr. Langer contains thousands of pages, including various materials provided without solicitation to the Board by Dr. Langer's ex-wife, Kristen Nicole Carver, who consented to the release of those materials to Dr. Langer. Those and other documents

received by the Board that were eligible to be disclosed to the Applicant were provided to Dr. Langer so that he could have an opportunity to consider and respond to them.[1]

Applicant was ably represented by Gregory Brown and Colleen Conboy of Lowe, Yeager & Brown, PLLC, who submitted various briefs and argument to the Board. Pursuant to Tenn. Sup. Ct. R. 6, § 12.14, the Board appointed as a special assistant attorney Scott Griswold, who acted as counsel for the Board during its investigation of this matter and the conduct of the Show Cause Hearing and who commendably discharged his duties.

The Board conducted a lengthy show-cause hearing via videoconference on January 26 and 27, 2021, where it received testimony from Applicant and numerous witnesses supportive of Applicant's character and fitness along with argument. Those witnesses included former LMU Dean Gary Wade, a former colleague of Dr. Langer's in the medical field, a psychologist from Dr. Langer's divorce case, and Dr. Langer's divorce attorney. Because Ms. Carver submitted additional information to the Board after the hearing, the Board shared that information with Dr. Langer and permitted him to file a supplemental brief to address it, which Dr. Langer's counsel did. The Board has carefully considered all of Dr. Langer's submissions.

## II.  Factual Background

Certain factual background is helpful for purposes of understanding the Board's analysis. Although this summary does not address all facts relevant to this matter or discussed below, it does provide facts that give important context for the Board's analysis.

Around 2005, Dr. Langer graduated from medical school at Poznan Medical Science University in Poland. Rather than practicing medicine, Dr. Langer went straight into the medical

---

[1] References to the record for Dr. Langer in this Order are to the bates-numbered pages and prefixed by "R." References to the hearing transcript indicate volume and page number.

business, pursuing a career in healthcare consulting and administration. In 2006, he obtained an MBA from the University of Tennessee. Beginning around 2005 or 2006, he spent some years working for Continuum Health Partners, Inc. at St. Luke's Roosevelt Hospital Center in New York, New York. Dr. Langer recounts that in 2009, while working in New York, he was first diagnosed with a relapsing-remitting form of multiple sclerosis ("MS"), from which he continues to suffer.

In the fall of 2010, Dr. Langer moved to Tennessee, becoming Chief Operating Officer and, before long, Chief Executive Officer for Cookeville Regional Medical Center. In 2012, two significant things occurred in Dr. Langer's life. He separated from his wife of nine years, Ms. Carver, with whom Dr. Langer has shared custody of two children. (They divorced in 2013.) And, Cookeville Regional Medical Center fired him. That firing arose after Dr. Langer obtained a significant pay raise based on an agreement that he had drafted, and that was signed by the Chairman of the Board for Cookeville Regional Medical Center, but which was not disclosed immediately to the full hospital Board. The full hospital Board's discovery of it led to Dr. Langer's dismissal as CEO and various legal disputes between Dr. Langer and Cookeville Regional Medical Center. Dr. Langer states that his MS worsened in 2012, likely due to the stress related to his separation from his wife and the dispute resulting in his dismissal by Cookeville Regional Medical Center. As a result, he became totally disabled from working.

Dr. Langer reached a settlement of his termination-related dispute with Cookeville Regional Medical Center in which he received payment in exchange for being "available" as an "Executive Consultant" to the hospital. That arrangement lasted from November 1, 2012 to January 2, 2015. Dr. Langer admitted that he performed no work for the hospital during that period, nor was he ever asked to perform any work. His resume submitted in connection with his bar application nonetheless lists him as working as an Executive Consultant for Strategy & Integration

for Cookeville Regional Medical Center from November 2012 through January 2015. R.162. And no later than March 2013, Dr. Langer started a business called Langer Healthcare Consulting, LLC, which Dr. Langer also listed on his resume as being active from March 2013 through the "present." R.162.

Meanwhile, Dr. Langer sought benefits under a Sun Life policy for total disability based on the resurgence of his MS. In the context of a lawsuit filed in 2014 against Sun Life and Cookeville Regional Medical Center, Dr. Langer testified in 2014 that (among other things) he was permanently and totally disabled from all employment not only due to cognitive impairment, but also due to physical impairment, relating to his MS. In addition, the record revealed that Dr. Langer had previously signed applications for disability benefits with other insurers as early as 2009 and 2011. Dr. Langer testified in the Sun Life lawsuit that he did not recall making those applications, but he did not deny that they bore his genuine signature. R.231–32, 557, 2321, 2378, 2406–08. Eventually, around the time he began law school at LMU, Dr. Langer settled his disability dispute with Sun Life and Cookeville Regional Medical Center.

Dr. Langer began his law studies at LMU in 2017 and graduated in 2020. According to Dr. Langer, his MS symptoms had gone back into remission during the 2014–2015 period, which enabled him to eventually take on law studies. While in law school his relationship with his ex-wife deteriorated, in large part, Dr. Langer explained, because in 2019 she began dating Daniel Crowe, another LMU law student and former friend of Dr. Langer, who developed ill will toward Dr. Langer. Subsequently, Dr. Langer and his ex-wife have been fighting bitter legal battles over child custody.

After graduating from LMU law school in about April 2020, Dr. Langer applied for and received permission to practice pending admission under Tenn. Sup. Ct. R. 7, § 10.04, which

requires the applicant to practice under supervision and which, construed in conjunction with Tennessee Rules of Professional Responsibility, prohibits the applicant from misleading the public into thinking that he is a fully licensed lawyer. Nonetheless, almost immediately after graduating from LMU, Dr. Langer began describing himself in his LinkedIn profile as a "partner" with "Langer Law Group," thus suggesting to the public that Dr. Langer was fully licensed. Dr. Langer has since acknowledged his LinkedIn representation was inappropriate.

**III.     Analysis**

    **A.     Summary**

The entire record before the Board, which is voluminous, establishes that Dr. Langer has engaged in on-going conduct involving misrepresentations and omissions that demonstrate a serious and repeated lack of candor. Applicant's testimony at the hearing was often evasive and self-serving, sometimes lacked credibility and, when combined with other evidence in the record, shows that he tends to opportunistically treat facts as malleable to suit his needs in particular circumstances. Moreover, Applicant displayed an evident inability to acknowledge or to appreciate his own lack of candor. As for the testimony from the other witnesses, the Board finds that their contributions, while credible and often supportive, did not overcome the reasonable doubts about character arising from the documentary record and Applicant's testimony. For these reasons, the Board continues to harbor reasonable doubts concerning Applicant's honesty, respect for the rights of others, and adherence to Tennessee law. Consequently, the Board concludes that Dr. Langer is unlikely to adhere to the duties and standards of conduct required of attorneys in this State. The Board discusses below several specific sets of facts that support these conclusions.

### B. General Legal Standards

The Tennessee Supreme Court entrusts the Board with the responsibility to determine whether applicants possess the character and fitness required of persons to be admitted to the Tennessee bar. In particular, an applicant "shall not be admitted if the Board finds reasonable doubt as to that applicant's reputation, character, honesty, respect for the rights of others, fitness to practice law, and adherence to and obedience to the Constitution and laws of Tennessee and the United States and concludes that such applicant is unlikely to adhere to the duties and standards of conduct imposed on attorneys in this state." Tenn. Sup. Ct. R. 7, § 6.01(a). In assessing an applicant's character and fitness, the Board shall also consider any "conduct which would constitute grounds for discipline if engaged in by an attorney in this State[.]" *Id.* Every applicant "has a duty to be candid and to make full, careful and accurate responses and disclosures in all phases of the application and admission process." *Id* § 6.04(a).

In satisfying this duty, it is "unacceptable for an applicant to give either an incomplete or misleading description of past events reflecting on the applicant's qualifications for admission to the bar." *Id.* The applicant has a continuing obligation to update responses to his or her application for admission or any other information requested in the application process. *Id.* § 3.02. If an applicant fails or refuses to "answer fully any question on the application or to furnish information or submit to examination as required by the application or pursuant to the provisions of this Rule," the Board shall possess sufficient cause to refuse admission to the Tennessee bar. *Id*. § 6.04(c); *see also* § 6.05 (giving false information or making false statements on the application or to the Board is also sufficient grounds to deny admission).

Similarly, at the hearing of a show-cause order, the applicant–respondent shall bear the burden of proof. *Id*. § 13.03(c). While the Board is not bound by the Rules of Evidence, it may

"admit and give probative effect to any evidence which in the judgment of the Board possesses such probative value as would entitle it to be acceptable by reasonably prudent persons in the conduct of their affairs," and it may "exclude incompetent, irrelevant, immaterial and unduly repetitious evidence." *Id.* § 13.03(e). Evidence may come in the form of documents, including, but not limited to, copies or excerpts or by the incorporation doctrine. *Id.* §§ 13.03(b) & (g).

### C. Child-custody Communications and Conduct

At the outset, the Board recognizes that Applicant is involved in volatile and protracted child-custody proceedings with his former spouse and has a difficult relationship with her and a former law school classmate, Mr. Crowe, who is now married to Applicant's former spouse. Dr. Langer's relationship with his ex-wife became verbally combative, and many of the materials that Ms. Carver submitted to the Board include or relate to interpersonal conflicts involving Ms. Carver, Mr. Crowe, and Dr. Langer. In briefing, argument, and testimony, Dr. Langer painted Ms. Carver and Mr. Crowe as attempting to destroy Dr. Langer's character out of animus toward him. Although the Board, and Mr. Griswold at the Board's direction, reviewed such materials, the Board generally finds them of little significance to the show-cause hearing.

Some communications by Dr. Langer displayed intemperance and incivility (as did communications from Mr. Crowe), which had led the Board to mention them in its Show Cause Order. But Dr. Langer's profane, combative, and sometimes threatening communications are mitigated by the fact that they came in the context of divorce and child-custody matters in which provocation came from both sides. That mitigation is further supported by the testimony of Dr. Langer's child-custody lawyer, Ms. Allison Easterday, and the court-appointed psychologist, Dr. Lance Laurence, who had examined Dr. Langer in relation to child-custody proceedings, and whose testimony the Board credits.

### D. Dr. Langer's MS

The Board does not doubt that Applicant has been diagnosed with a serious medical condition, MS. And, the Board generally credits Dr. Langer's testimony concerning his experience with MS and its effects on him. The Board's decision does not depend on whether or to what degree Dr. Langer has suffered from MS or other medical conditions. Instead, the Board's decision to deny bar admission to Dr. Langer focuses on his conduct and his representations, including how he has chosen to portray himself to the Board and others. Had the Board decided to admit Dr. Langer, it might have imposed a conditional admission and perhaps required Dr. Langer to meet certain conditions imposed by TLAP. But in denying admission, the Board does not conclude that Dr. Langer is medically unfit to practice law; the Board bases its decision on issues relating to Dr. Langer's character.

### E. Prior Employment with Cookeville Regional Medical Center

Significant to the Board's ruling is Dr. Langer's dealings with his former employer, Cookeville Regional Medical Center. While employed there, Dr. Langer obtained a substantial pay increase as CEO of Cookeville Regional Medical Center by self-preparing an amendment reflecting the increase. Tr. (Jan. 27, 2021), Vol. II., p. 134–36; R.1485. Even though the hospital had in-house legal and human-resource departments, Dr. Langer did not go through those departments but instead caused the amendment to be executed by the hospital Board Chairman quickly and unilaterally under circumstances that give rise to an inference of opportunism and even deception. The Board does <u>not find credible</u> Dr. Langer's testimony that "the numbers" for the raise came from the hospital's HR department. Tr. (Jan. 27, 2021), Vol. II., p. 134.

When the full hospital Board much later learned of the pay raise, it was troubled by Dr. Langer's conduct and ended up terminating his employment. At the show-cause hearing, Dr.

Langer downplayed that situation as merely "a miscommunication" between him and the hospital Board Chairman, and Dr. Langer blamed others for the fact that it became a problem. Tr. (Jan. 27, 2021), Vol. II., p. 119–20. Rather than taking responsibility for his own conduct, Dr. Langer said the rest of the hospital Board made him a scapegoat and "pushed [him] out instead of dealing with the individual that was responsible for the action." *Id.*, p. 120; *see* R.1490–91. Despite Dr. Langer's characterizations to the contrary, the December 28, 2012 settlement agreement between Applicant and Cookeville Regional Medical Center does not state that the termination was without cause or involved no violation of trust by Dr. Langer. *See* Ex. L to Langer Resp. to Show-Cause Order; R.129-132.

In connection with his bar application, Applicant described the situation with Cookeville Regional Medical Center as follows:

> A contract dispute occurred. An amendment was signed by the then current board chairman that the following chairman attempted to reverse. A settlement was negotiated. I was then re-employed by the organization through 1/2015.
>
> * * *
>
> Employment - 10/2012 - Cookeville Regional Medical Ctr. – Terminated. Contract Dispute. Settlement was reached and Applicant was re-employed through 01/2015.

R.1–2. Although Applicant thus disclosed the situation, the <u>Board finds it was misleading for Dr. Langer to characterize it merely as a "contract dispute" that was settled</u>, resulting in Dr. Langer's "re-employment."

The evidence tends to show that, despite the settlement-related "consultant" arrangement, neither Dr. Langer nor Cookeville Regional Medical Center had any intention that Dr. Langer <u>would actually continue to provide services to the hospital after he had been terminated as CEO</u>. The settlement agreement between Dr. Langer and Cookeville Regional Medical Center required

the hospital to make the same payments to Dr. Langer regardless of whether he actually provided any consulting services to the hospital—a fact that Dr. Langer admitted. *See* Ex. L to Langer Resp. to Show-Cause Order; Tr. (Jan. 27, 2021), Vol. II, p. 180. And unsurprisingly, Dr. Langer (admittedly) did nothing as a consultant for Cookeville Regional Medical Center. R.1495.

In sum, the Board finds that the circumstances relating to Dr. Langer's pay raise as CEO and his attempts to downplay the significance of that situation and his role in it provide reasonable bases for substantial doubts that Dr. Langer would be honest and candid as a lawyer and would respect the legal rights of others. And his representation that he continued to be employed as a consultant by the hospital after he was fired as CEO, while perhaps formally or technically accurate based on the settlement agreement, was in substance misleading.

### F. Disability Lawsuit and Representations about Working

Dr. Langer was subsequently involved in a lawsuit against Cookeville Regional Medical Center and its long-term disability insurer, Sun Life, over benefits under a long-term disability policy and promises of disability coverage. After his employment as CEO with Cookeville Regional Medical Center had ended in October 2012, Dr. Langer stated that his MS had worsened, and he submitted a claim for disability payments under the Sun Life policy. R.594–622. Dr. Langer listed his last day worked as 12/31/2013. R.594. After that claim was denied, Tr. (Jan. 26, 2021), v. I, p. 97, Dr. Langer sued in 2014, eventually bringing claims against both Sun Life (under the policy) and Cookeville Regional Medical Center (for promising to provide continuing disability benefits per the settlement agreement).

In the context of that lawsuit, Dr. Langer provided testimony that raises substantial doubts concerning his honesty and candor. First, for example, he testified under oath that he had "worked"

as a consultant for Cookeville Regional Medical Center, when, in fact, he had performed no such duties. R. 1495, 1511.

Second, Applicant told evaluators during his TLAP-mandated medical examination that he had filed for disability benefits for only 18 months, when he had in fact sought permanent disability benefits. R. 48-49. That assertion in the context of his TLAP medical examination contradicted his sworn pretrial testimony concerning the permanence of his disability.

Third, in his Supplemental Post-Hearing Brief, Applicant asserts that, under the long-term disability policy, he was "disabled from employment as CEO of a hospital." Br., p. 2. But in connection with his disability lawsuit, Dr. Langer testified that he was disabled from *all* employment. Dr. Langer testified in an interrogatory response in the disability lawsuit: "I am permanently and totally disabled from all employment primarily from cognitive impairment but also from physical impairment" relating to MS. R.556–57. And in his deposition, given on January 27, 2015, Dr. Langer testified that he was disabled from working due to "[c]ognitive dysfunction and . . . some physical disabilities." R.1476, 1508. He stated in his deposition that his relapse of MS in November 2012 led to him becoming disabled from working by 2014. R.1510. When questioned about how that was consistent with his continuing "employment" by the hospital as a consultant after November 2012, he said his job was "be[ing] available as a consultant if they required my services." R.1511.

But in his resume, which he provided to LMU in support of his application to law school, R.161–66, Dr. Langer represented that he had worked as an Executive Consultant for Strategy & Integration for Cookeville Regional Health System from November 2012 through January 2015. R.162. His resume also states that, no later than March 2013, Dr. Langer started a business called Langer Healthcare Consulting, which he represented as being active from March 2013 through the

"present." R.162. Those representations contradict his testimony in his disability lawsuit that he was permanently and totally disabled during that same time period. Dr. Langer has made similar representations to the public about his work experience through a website for Langer Healthcare Consulting. *See* Ex. M to Langer Resp. to Show-Cause Order.

The Board questioned Dr. Langer at length about that contradiction during the show-cause hearing. He was unable to provide a convincing explanation that reconciled his competing representations (on the one hand, that he was totally and permanently disabled from working and, on the other hand, that he was in fact working during the same time period). *See* Tr. (Jan. 27, 2021), Vol. II, pp. 151–86. At the show-cause hearing, Dr. Langer tried to show that his medical condition eventually improved, which allowed him to go to law school. But his timeline did not resolve the contradiction. At the show-cause hearing, Dr. Langer also resorted to parsing words and minimizing facts. He claimed, for example, he did not really have any significant clients while conducting Langer Healthcare Consulting, despite his representations in his resume and on his website.

It appears to the Board that Dr. Langer was and remains willing to make factual representations to suit his needs or desires regardless of whether those representations are true. When pressed at the hearing concerning his contradictory factual positions, Dr. Langer seemed unable to even comprehend why it is problematic to assert, on the one hand, his inability to work when seeking disability benefits while, on the other hand, to tout his work experience from the same time period he claimed to be disabled when seeking to impress the public to hire him for his services or to gain admission to law school. For that reason, among others, it seems to the Board that Dr. Langer is willing to treat facts as malleable things to be shaped to suit the circumstances.

The Board thus has substantial doubts about Applicant's honesty, candor, and respect for the rights of others and finds that Applicant is unlikely to adhere to the duties and standards of conduct imposed on attorneys in Tennessee. That finding does not require the Board to question whether Dr. Langer was in fact disabled for a time due to his MS. Dr. Langer may have been disabled just as he claimed, and the Board does not find otherwise. His representations are the problem.

### G. Law School Application

As stated above, Dr. Langer misrepresented his job duties as a consultant for Cookeville Regional Health System on his resume, which was provided with his application for admission to law school. Likewise, Applicant claimed in his application for admission to law school that he had never been accused of a violation of trust, which contradicts the published statements made by Cookeville Regional Health System representative to local news media. R. 152 – 166, and 710 – 717.

### H. Application for Admission by Examination

Dr. Langer did not disclose in his bar application two lawsuits to which Dr. Langer was a party: *Sarwar v. BMW of North America, LLC*, Case No. 2:18-cv-16750, U.S. District Court for the District of New Jersey and *Langer v. BMW of North America, LLC*, Case No. 3:20-cv-00037, U.S. District Court for the Eastern District of Tennessee. Dr. Langer represented and testified that he had not known he was a party to these lawsuits and first learned about them through the Board's show-cause order. The Board finds his testimony on this point not entirely convincing.

### I. Misrepresentation About Status as Lawyer

After graduating from law school, Dr. Langer created a misleading online profile, wherein he represented that he was an attorney and partner in Langer Law Group. R. 305-306. This online

profile violated the terms of Applicant's practice-pending-admission status, and Applicant admitted such violation and apologized both in his response to the show-cause order and during the hearing. Tr. (Jan. 27, 2021), Vol. II, p. 126. That is to Applicant's credit. Nonetheless, he tried to explain it away and minimize it by contrasting "J.D." with "Esquire" and, more concerning, by suggesting that most law-school graduates misrepresent their bar status to the public. Tr. (Jan. 27, 2021), Vol. II, pp. 126–28. Once again, Dr. Langer thus tried to minimize or excuse his own conduct by pointing to alleged misconduct by others. The Board finds that that tendency raises substantial doubt whether Dr. Langer can be expected to adhere to the Rules of Professional Conduct governing lawyers were he to be admitted to the bar. This issue also raises unanswered questions about the unauthorized practice of law.

### J.  Lack of Civility

Following graduation from law school, Dr. Langer was involved in a contentious order-of-protection proceeding with his former spouse's current husband, Mr. Crowe. Applicant represented in a self-prepared pleading that he had obtained a judgment against his former spouse, which was not accurate. R. 1256. Applicant's self-prepared pleadings display a profound lack of civility and respect towards opposing counsel. Applicant likewise made numerous personal attacks against his opposing counsel in self-prepared pleadings he filed in the Loudon County, Tennessee court. R. 1253. While the Board does not condone and is troubled by some of Applicant's vitriolic and offensive communications with his ex-wife, Applicant's willingness to strike a similar tone in court pleadings raises even more significant concerns about Applicant's future adherence to the standards governing lawyers in Tennessee. R. 504, 528, 548, 567, 569-70.

## IV.  Conclusion

The Board's opinion does not cover everything that raised doubts concerning Dr. Langer's character, but rather addresses key issues. And ultimately, it was the entire record taken as a whole that has raised substantial and persisting concerns about Dr. Langer's character for honesty and candor, his respect for the rights of others, and the likelihood of his adherence to the professional standards of conduct applicable to lawyers licensed to practice in Tennessee.

The Board finds that some of Applicant's above-described conduct would constitute grounds for discipline if engaged in by an attorney in this State. *See* Tenn. Sup. Ct. R. 8, RPC 3.3(a)-(d) (candor toward the tribunal); and 8.4(c)-(d) (misconduct); *see also* Tenn. Sup. Ct. R. 7, § 6.01(a) (requiring the Board to consider such conduct in making its evaluation of the character of an applicant).

The Tennessee Supreme Court prohibits admission to the bar when the Board finds reasonable doubt as to that applicant's honesty, respect for the rights of others, and adherence to Tennessee law and concludes that the applicant is unlikely to adhere to the duties and standards of conduct imposed on attorneys in this State. *See* Tenn. Sup. Ct. R. 7, § 6.01(a). Here, the record before the Board creates reasonable doubt as to Applicant's honesty, respect for the rights of others, and adherence to Tennessee law and further leads to the conclusion that Applicant is unlikely to adhere to the duties and standards of conduct imposed on attorneys in Tennessee.

The Board's findings and conclusions are based on Applicant's acts evincing dishonesty or deception and the lack of respect for the rights of others. Applicant is evidently willing to mischaracterize and misrepresent facts, and this conduct is antithetical to the duties and standards of conduct imposed on attorneys in this State.

**ACCORDINGLY**, **IT IS ORDERED** that Menachem Langer's application for admission by examination to the Bar of Tennessee is **DENIED**. It is **FURTHER ORDERED** that Dr. Langer is not eligible to re-apply to the Bar of Tennessee for three (3) years from the date of order.

Entered this 29th day of March, 2021.

**TENNESSEE BOARD OF LAW EXAMINERS**

Jeffrey M. Ward, President
Robert F. Parsley, Vice-President
Amy M. Pepke, Secretary-Treasurer
William L. Harbison
Travenia A. Holden

**ATTEST:**

_____
Lisa Perlen
Executive Director

## CERTIFICATE OF MAILING

On this 29th day of March, 2021, a certified copy of the Order Resolving Show Cause for Docket Number 20-18, MENACHEM LANGER, was sent by email only due to the continuing COVID-19 pandemic order of the Tennessee Supreme Court to:

Gregory Brown
Lowe, Yeager & Brown, PLLC
gb@lyblaw.com

Menachem Langer
mlangermd@gmail.com

_____
Administrative Assistant